UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| M. LEE ARNOLD, Derivatively On Behalf of STAR GAS PARTNERS, L.P., | ) ) ) | Civil Action No. |
| Plaintiff, | ) ) ) | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, |
| vs. | ) ) ) | ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF |
| IRIK P. SEVIN, AMI A. TRAUBER, JOSEPH P. CAVANAUGH, RICHARD F. AMBURY, AUDREY L. SEVIN, PAUL BIDDELMAN, THOMAS J. EDELMAN, I. JOSEPH MASSOUD, WILLIAM P. NICOLETTI, STEPHEN RUSSELL, | ) ) ) ) ) ) ) ) | CORPORATE ASSETS AND UNJUST ENRICHMENT |
| Defendants, | ) ) ) ) | |
| - and - | ) ) ) | |
| STAR GAS PARTNERS, L.P., a Delaware Limited Partnership, | ) ) ) | |
| Nominal Defendant. | ) ) ) | DEMAND FOR JURY TRIAL |

**COMPLAINT**

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought by a shareholder of Star Gas Partners, L.P. ("Star Gas" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches

-1-

of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between July 25, 2000 and the present (the "Relevant Period").

2.      The defendants' actions have caused the Company to be subjected to multiple class action lawsuits for violating federal securities laws and have caused the Company's stock to be downgraded.  As a result, the Company suffered severe, irreparable, injury and damages, particularly to its reputation and goodwill in the investment and business community.  At the same time, certain defendants fared much better, reaping $829,684.08 in illegal insider trading proceeds.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive one to confer jurisdiction on this Court it would not otherwise have.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

4.      Plaintiff brings this action on behalf of Star Gas pursuant to Rule 23.1 of the Federal Rules of Civil Procedure based on principles of state law which prohibit breach of the federal securities law by officers and directors of public corporations, breach of fiduciary duty of corporate candor by corporate fiduciaries and the misappropriation of corporate information which was not available to the public investors during the Relevant Period when Star Gas' stock was artificially inflated due to the false and misleading information disseminated by the defendants.

5.     Venue is proper in the Court pursuant to 28 U.S.C. §1391(a) because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  One or more of the defendants either resides in or maintain executive offices in this District, and defendants have received substantial compensation in this District by engaging in numerous activities and conduction business here, which had an effect in this District.

### SUMMARY OF THE ACTION

6.     This is an action on behalf of purchasers of Star Gas Partners, L.P. ("Star Gas" or the "Company") publicly traded securities (NYSE: SGU NYSE: SGH) during the Relevant Period.  Star Gas is a diversified home energy distributor and service provider, specializing in heating oil, propane, natural gas and electricity.

7.     During the Relevant Period, defendants caused Star Gas' shares to trade at artificially inflated levels through the issuance of false and misleading statements.  As a result of this inflation, Star Gas was able to complete a secondary public offering of 1.3 million common units and two note offerings totaling $65 million, raising net proceeds of $95 million during the Relevant Period.

8.     On October 18, 2004, *TheStreet.com* issued an article entitled "Stocks In Motion: Star Gas." The article stated in relevant part:

> Earnings at Star Gas' heating oil unit are expected to decline substantially, the company said, which will not permit it to meet the borrowing conditions under its working capital line.  Star is currently in talks with lenders to modify conditions and other terms that would allow its business unit to operate through the winter.  If lenders do not agree, however, to offer modified terms, Star said it could be forced to seek alternative financing on "extremely disadvantageous" terms or even be forced to seek bankruptcy protection.

9.     On this news, Star Gas' stock dropped to $4.32 per share from a closing price of $21.60 on the previous trading day.

10.     The true facts, which were known by each of the defendants but concealed from the investing public during the Relevant Period, were as follows:

(a)     Star Gas was experiencing serious problems as a result of its reorganization, particularly in the area of customer service, which was deteriorating rapidly, resulting in a migration of customers;

(b)     the purported cost savings from the restructuring in the heating oil division had not materialized and, in fact, had resulted in operating deficiencies that negatively impacted the Company;

(c)     the Company had not adequately hedged against a sharp rise in heating oil prices during the Relevant Period;

(d)     the Company was ill-equipped to handle the surge in heating oil prices during the Relevant Period and falsely comforted investors with representations that Star Gas would simply pass on high wholesale prices to retail customers;

(e)     the Company's problems and deteriorating business seriously threatened its ability to pay out its quarterly distribution;

(f)     the Company's business had deteriorated so sharply over the Relevant Period that it was in palpable danger of breaching financial and/or performance covenants in its loan agreements, thereby seriously jeopardizing its liquidity and viability;

-4-

(g)     the Company's second quarter 2004 claimed profit margins were an aberration and not indicative of the Company's success or ability to pass on the heating oil price increase because the Company had earlier acquired heating oil (sold in the second quarter) at a much lower basis; and

(h)     that as a result of (a)-(g), defendants were facing imminent bankruptcy and would no longer be able to service the Company's debt, all of which would halt the Company's ability to maintain the Company's credit rating and/or obtain future financing.

## THE PARTIES

11.     Plaintiff M. Lee Arnold is, and was at times relevant hereto, an owner and holder of Star Gas common stock.  Plaintiff Arnold is a citizen of Missouri.

12.     Nominal defendant Star Gas is a limited partnership organized and existing under the laws of the state of Delaware with its headquarters located at, 2187 Atlantic Street, Stamford, Connecticut 06902.  According to the Company's 10-K filed with the Securities Exchange Commission ("SEC") on or about December 22, 2003, Star Gas is a diversified home energy distributor and services provider, specializing in heating oil, propane, natural gas and electricity. Star Gas is a master limited partnership, whose Units are publicly traded over the New York Stock Exchange ("NYSE").

13.      Defendant Irik P. Sevin ("Sevin") is, and at all times relevant hereto was, Chairman of the Board of Directors (the "Board"), Chief Executive Officer ("CEO") and a director of Star Gas. Because of Sevin's positions, he knew the adverse non-public information about the business of Star Gas, specifically its failing business improvements program that was not generating profits as claimed by the defendants and the Company was facing imminent

bankruptcy, as well as the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Sevin participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:00, FY:01, FY:02 and FY:03, Star Gas paid defendant $1,746,088, $2,190,166, $610,850 and $1,502,200 respectively, in salary, bonus and other compensation. For FY:00 and FY:03 Star Gas granted defendant Sevin 400,000 and 77,419 options to purchase Star Gas stock, respectively.  Sevin is a citizen of New York.

14.    Defendant Ami A. Trauber ("Trauber") is, and at all times relevant hereto was, Chief Financial Officer of Star Gas.  Because of Trauber's position, he knew the adverse non-public information about the business of Star Gas, specifically its failing business improvements program that was not generating profits as claimed by the defendants and the Company was facing imminent bankruptcy as well as the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to  him in connection therewith. During the Relevant Period, Trauber participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY: 02 and FY: 03, Star Gas paid defendant Trauber $327,000 and $583,112, respectively, in salary, bonus and other compensation.  For FY:02 and FY:03 Star Gas granted defendant Trauber 54,472 and

46,452 options to purchase Star Gas stock respectively.  During the Relevant Period, Trauber sold 5,132 shares of Star Gas stock for proceeds of $110,556.08.  Trauber is a citizen of Florida.

15.     Defendant Joseph P. Cavanaugh ("Cavanaugh") is, and at all times relevant hereto was, CEO- Propane and Member of the Office of the President of Star Gas.  Because of Cavanaugh's position, he knew the adverse non-public information about the business of Star Gas, specifically its failing business improvements program that was not generating profits as claimed by the defendants and the Company was facing imminent bankruptcy, as well as the Company's profit margins as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to  him in connection therewith.  During the Relevant Period, Cavanaugh participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:00, FY:01, FY:02 and FY:03, Star Gas paid defendant Cavanaugh $225,000, $564,118, $370,855, $554,628, respectively, in salary, bonus and other compensation.  During the Relevant Period, Cavanaugh sold 7,000 of Star Gas stock for proceeds of $143,128.  Cavanaugh is a citizen of New York.

16.     Defendant Richard F. Ambury ("Ambury") is, and at all times relevant hereto was, Vice President and Treasurer of Star Gas.  Because of Ambury's positions, he knew the adverse non-public information about the business of Star Gas, specifically its failing business improvements program that was not generating profits as claimed by the defendants and the Company was facing imminent bankruptcy as well as the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations

-7-

and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Ambury participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:00, FY:01, FY:02 and FY:03, Star Gas paid defendant Ambury $291,032, $380,982, $250,469, $384,676, respectively in salary, bonus and other compensation.  For FY:03 Star Gas granted defendant Ambury 9,917 options to purchase Star Gas stock. During the Relevant Period Ambury sold 5,000 shares of Star Gas for proceeds of $106,000.  Ambury is a citizen of Connecticut.

17.     Defendant Audrey L. Sevin ("Audrey Sevin") is, and at all times relevant hereto was, a director and Secretary of Star Gas. Because of Audrey Sevin's position, she knew the adverse non-public information about the business of Star Gas, specifically its failing business improvements program that was not generating profits as claimed by the defendants and the Company was facing imminent bankruptcy as well as the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith.  During the Relevant Period, Audrey Sevin participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Audrey Sevin is a citizen of New York.

18.     Defendant Paul Biddelman ("Biddelman") is, and at all times relevant hereto was, a director of Star Gas.  Because of Biddelman's position, he knew the adverse non-public

information about the business of Star Gas, specifically its failing business improvements program that was not generating profits as claimed by the defendants and the Company was facing imminent bankruptcy as well as the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Biddelman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Biddelman is a citizen of New York.

19.     Defendant Thomas J. Edelman ("Edelman") is, and at all times relevant hereto was, a director of Star Gas.  Because of Edelman's position, he knew the adverse non-public information about the business of Star Gas, specifically its failing business improvements program that was not generating profits as claimed by the defendants and the Company was facing imminent bankruptcy as well as the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Edelman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period Edelman sold 20,000 shares of Star Gas for proceeds of $470,000. Edelman is a citizen of New York.

20.     Defendant I. Joseph Massoud ("Massoud") is, and at all times relevant hereto was, a director of Star Gas.  Because of Massoud's position, he knew the adverse non-public information about the business of Star Gas, specifically its failing business improvements program that was not generating profits as claimed by the defendants and the Company was facing imminent bankruptcy as well as the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Massoud participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Massoud is a citizen of Connecticut.

21.     Defendant William P. Nicoletti ("Nicoletti") is, and at all times relevant hereto was, a director of Star Gas.  Because of Nicoletti's position, he knew the adverse non-public information about the business of Star Gas, specifically its failing business improvements program that was not generating profits as claimed by the defendants and the Company was facing imminent bankruptcy as well as the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Nicoletti participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Nicoletti is a citizen of New Jersey.

22.     Defendant Stephen Russell ("Russell") is, and at all times relevant hereto was, a director of Star Gas.  Because of Russell's position, he knew the adverse non-public information about the business of Star Gas, specifically its failing business improvements program that was not generating profits as claimed by the defendants and the Company was facing imminent bankruptcy as well as the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Russell participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Russell is a citizen of Indiana.

23.     The defendants identified in ¶¶13, 17-22 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶13-17 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶14-16, 19 are referred to herein as the "Insider Selling Defendants."  Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

24.     By reason of their positions as officers, directors and/or fiduciaries of Star Gas and because of their ability to control the business and corporate affairs of Star Gas, the Individual Defendants owed Star Gas  and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Star Gas  in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Star Gas and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

25.     Each director and officer of the Company owes to Star Gas  and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

26.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Star Gas, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Star Gas, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Star Gas.

27.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Star Gas, and was at all times acting within the course and scope of such agency.

28.     To discharge their duties, the officers and directors of Star Gas were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Star Gas were required to, among other things:

a.  refrain from acting upon material inside corporate information to benefit themselves;

b.  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

c.  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

d.  properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

-13-

    e.   remain informed as to how Star Gas conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

    f.   ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

29.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Star Gas, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Star Gas' Board during the Relevant Period.

30.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course

of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws.  As a result, Star Gas  has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

31.     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

32.     Costs incurred in investigating and defending Star Gas and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

33.     Moreover, these actions have irreparably damaged Star Gas' corporate image and goodwill.  For at least the foreseeable future, Star Gas will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Star Gas' ability to raise equity capital or debt on favorable terms in the future is now impaired.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

34.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

35.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (I) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants

to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Star Gas and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; (iii) dispose of $829,684.08 in inflated stock; and (iv) deceive the investing public, including shareholders of Star Gas, regarding the Individual Defendants' management of Star Gas' operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

36.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least July 2000 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that Star Gas was misrepresenting its financial results. In addition, defendants also made other specific, false statements about Star Gas' financial performance and future business prospects, as alleged herein.

37.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Star Gas common stock so they could: (i) dispose of $829,684.08 of their personally held stock; (ii) complete a secondary public offering

-16-

of 1.3 million common units and two note offerings totaling $65 million, raising proceeds of $95 million during the Relevant Period; and (iii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

38.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

39.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her  overall contribution to and furtherance of the wrongdoing.

**BACKGROUND**

40.     Star Gas is a diversified home energy distributor and service provider, specializing in heating oil, propane, natural gas and electricity.

41.     Prior to the Relevant Period, Star Gas' Petro heating oil division attempted to develop a competitive advantage in customer service, and as part of that effort, centralized its heating equipment service dispatch and engaged in a centralized call-center to fulfill its

telephone requirements.  The successful implementation of this initiative took longer than defendant had claimed, which adversely impacted the customer base.

42.     Heating oil distributors, like Star Gas, often pay up front for supplies and wait weeks or months to collect the full amount from customers, so higher prices force them to finance larger sums.

## IMPROPER STATEMENTS

43.     On July 25, 2000 the Individual Defendants caused the Company to issue a press release entitled "Star Gas Partners, L.P. Reports Significant EBITDA Improvement in Fiscal 2000 Third Quarter."  The press release stated in relevant part:

> The division's improved operating procedures enabled it to improve its gross profit margins, despite significantly higher energy costs, without impacting its account base. In fact, for the second consecutive quarter the division's customer base, excluding acquisitions, grew in contrast to its historic attrition rates.
>
> In commenting on Star's strong financial performance, Chairman Irik P. Sevin, noted: "This past quarter was one of the best in Star's history, indicative of our performance when we are not impacted by unusually dry or warm weather conditions. Not only were the period's financial results gratifying, but of equal importance, were the following:
>
> 1) We have begun to see some meaningful results from our effort to capitalize upon Star's close, service-based relationship with its 600,000 customers. Our hard-working 800 technician service force is allowing us to successfully market additional rationally related products and services to Star's account base. The propane division's water conditioning sale efforts are achieving solid results, and Petro's initial air conditioning marketing efforts suggest the possibility of a larger opportunity than originally contemplated;
>
> 2) Star's acquisition program continues to be very active. For the nine months ended June 30, 2000, the Partnership purchased eleven companies, adding 40,000 new customers and 31 million gallons of annual volume. In the fiscal 2000 third quarter alone, five acquisitions were closed, accounting for 17,000 customers and 14 million gallons of annual volume;

3) Total Gas and Electric is growing slightly faster than expected, and is being integrated into Star's operating format. In addition, cross marketing initiatives between TG&E and Star's propane and heating oil divisions have commenced;

4) By focusing on operating excellence and customer sensitivity, we were able to manage our gross profit margins without impacting our account base this past year. It was especially pleasing to see the second consecutive quarter of customer growth, compared to the 4% - 5% attrition experienced a few years ago.

44.     On October 18, 2000 the Individual Defendants caused the Company to issue  a press release entitled "Star Gas Announces Seven Acquisitions."  The press release stated in relevant part:

Since the beginning of Star's Fiscal Year 2000 (October 1, 1999), including these acquisitions, the Partnership will have purchased 18 propane and heating oil companies, representing over 60,000 customers and approximately 50 million gallons of annual volume at an aggregate purchase price of $58.4 million.

In commenting on these developments, Irik Sevin, Star's Chairman, said: "Star's strategic acquisition program which has enabled the Partnership to opportunistically purchase many high quality companies that are integratable into our historic operating businesses. While we, of course, remain interested in individually large opportunities, we are particularly excited that this disciplined approach has enabled us to buy so many smaller but highly attractive businesses."

45.     On January 18, 2001, the Individual Defendants caused the Company to issue a press release entitled "Star Gas Partners, L.P. Reports Record Q1 FY '01 Earnings."  The press release stated in relevant part:

Star's performance benefitted [sic] from the contribution made by the Partnership's 22 acquisitions in fiscal 2000 and 2001, and 11% colder than normal weather during the December 31, 2000 quarter. Also contributing to this performance was a slight improvement in gross profit margins, despite higher energy costs, and the Partnership's heating oil division customer base organic growth. Calendar year 2000 results were achieved during a period that had relatively normal weather as the colder temperatures during this past quarter virtually offset last winter's warm conditions.

During the first quarter of fiscal year 2001, Star purchased eight propane and heating oil companies for an aggregate purchase price of $16.9 million. These acquisitions represent 17,600 new customers and 18.5 million gallons of annual volume.

In commenting on Star's record performance, Chairman, Irik P. Sevin, indicated: "We are very gratified with these results which demonstrate the Partnership's earnings potential when it is not impacted by exceptionally warm temperatures. I view this performance as the result of three basic factors: a) Star's active acquisition program which has not only grown the Partnership's size, but has done so in a disciplined and profitable manner; b) the significant attention and resources Star has devoted to developing an organization focused on operating excellence and customer satisfaction; and, c) structuring the Partnership to perform well even under warmer than normal temperatures, enabling it to realize significant benefits from colder weather."

46.     On April 20, 2001, the Individual Defendants caused the Company to issue a

press release entitled "Star Gas Partners, L.P. Reports Record Second Quarter Results; Declares

Quarterly Distribution On All Units."  The press release stated in relevant part:

During the second quarter of fiscal 2001, Star purchased two propane and heating oil companies for an aggregate purchase price of $44.5 million. These acquisitions represent 58,000 new customers and 50.2 million gallons of annual volume. Including these purchases, the Company has acquired ten propane and heating oil companies for a total purchase price of $61.3 million during the first six months of fiscal 2001. These companies account for 76,000 new customers and 68.7 million gallons of annual volume.

In commenting on Star's performance, Chairman, Irik P. Sevin, indicated: "We are very gratified with these results which demonstrate the Partnership's potential when it is not impacted by warmer than normal temperatures. I view this performance as the result of three basic factors: a) the significant attention and resources Star has devoted to developing an organization focused on operating excellence and customer satisfaction, enabling us to improve margins even in a high energy cost environment; b) structuring the Partnership to perform well even under warmer than normal temperatures, enabling it to realize significant benefits from colder weather; and c) Star's active acquisition program which, through 24 acquisitions over the past eighteen months, has not only grown the Partnership's size by approximately 25%, but has done so in a disciplined and profitable manner."

-20-

47.     On August 1, 2001, the Individual Defendants caused the Company to issue a

press release entitled "Star Gas Significantly Expands Heating Oil Operations With $120 Million

Acquisition of Nation's Third Largest Retail Distributor; Reports Fiscal Q3 Results; Declares

$0.575 Quarterly Distribution On All Units. " The press release stated in relevant part:

> Star Gas Partners, L.P. ("Star"), a diversified home energy distributor and services provider, specializing in heating oil, propane, electricity and natural gas, today announced it has signed a definitive agreement to purchase Meenan Oil, Inc. ("Meenan") of Syosset, NY for approximately $120 million.
>
> Meenan, founded in 1934, is believed to be the third largest retail home heating oil company in the country with $254 million in revenues for the twelve months ended March 31, 2001. For that same period, Meenan had pro forma EBITDA of $21.6 million, which would have increased Star's EBITDA by 22% and would have resulted in Distributable Cash Flow accretion of 23 cents per unit. Meenan will continue to be operated as a separate business unit under the direction of its current management team led by Vice President-Operations Dan Donovan.
>
> In addition to this purchase, the Partnership acquired seven additional businesses, five heating oil and two propane, since April 1, 2001. This would bring to 18 the acquisitions made since the beginning of fiscal year 2001. The heating oil companies purchased since the beginning of the third fiscal quarter are Charles L. Booth of North Kingstown, RI; Radiant Fuel Co., Inc. of Newton, MA; Tuthill & Young Oil of Port Jefferson, NY; C & W Oil of Monroe, CT; and Armstrong Heating & Air Conditioning Co., located in Levittown, PA. The two propane companies are SAAM Oil Company, Inc. of Scales Mound, IL and Quality Propane Service, Inc. of Gwinn, MI.
>
> Star also reported today its results for the nine months and three months ended June 30, 2001. For the nine month period, before the impact of SFAS No.133, Star's EBITDA grew 32% to $113.9 million, from $86.5 million in the year-ago period. Net income per unit, before the impact of SFAS No.133, increased 11% to $2.36 per unit, compared to $2.13 for the first nine months of fiscal 2000. As a result of this performance, Star's Distributable Cash Flow for the twelve months ended June 30, 2001, before the impact of SFAS No.133, was $56.8 million, or $2.67 per unit.

-21-

These nine-month results are primarily attributable to a 24% volume

increase largely due to the 30 businesses Star purchased over the past 21 months.

This acquisition program accounted for a 25% increase in EBITDA. The

Company's nine-month performance was also enhanced by a) a return to relatively

normal temperatures compared to the 10% warmer than normal weather

experienced during the prior year's nine months ended June 30, 2000; b) the

Company's focus on operating excellence and customer service which enabled it

to continue to improve gross profit margins, despite the higher energy costs

experienced this past year; and c) to increased air conditioning, heating equipment

and appliance sales.

48.    On November 26, 2002, the Individual Defendants caused the Company to issue a

press release entitled "Star Gas Partners, L.P. Reports 2002 Fiscal Fourth Quarter and Year End

Results, Announces Four Acquisitions." The press release stated in relevant part:

"Although we are disappointed with the effects the unprecedented weather

had on our fiscal 2002 operating results, we are very pleased with our ability to

cut the weather's impact on our results in half and the very positive results of our

disciplined acquisition program. In addition, we are also pleased with the

continuing progress our heating oil division's business process improvement task

force has made on capitalizing on our unique size in the home heating oil industry

to operate more cost effectively and with greater customer sensitivity as well as

with the consistent growth in our propane division, in which EBITDA, net income

and distributable cash flow all grew in spite of the weather, making it an

outstanding performer among its peer group."

49.     On January 21, 2003, the Individual Defendants caused the Company to issue a

press release entitled "Star Gas Partners, L.P. Reports Record 2003 First Quarter Results

Announces First Quarter Distribution." The press release stated in relevant part:

> "The cost savings measures instituted in reaction to last year's aberrational warm
> weather have been sustained and the heating oil segment is beginning to achieve
> very tangible benefits from its Business Process Improvement Program,
> demonstrated by the success of its oil delivery scheduling initiative. Third, Star's
> internal marketing programs and customer-oriented philosophy have resulted in
> the colder temperatures being translated commensurately into significantly higher
> volumes. Fourth, the Partnership's disciplined acquisition program continued to
> positively impact both operating profits and be DCF accretive."

50.     On August 6, 2003 the Individual Defendants caused the Company to issue a

press release entitled "Star Gas Partners, L.P. Reports 2003 Fiscal Third Quarter Results,

Achieves Record Q3 Sales Of $235.2 Million And Announces Six Acquisitions."  The press

release stated in relevant part:

> Star also announced that during the period from April 1, 2003 to date, the
> Partnership has acquired six heating oil and propane companies consisting of
> approximately 95,000 customers. These acquisitions are expected to add 81
> million gallons of annual volume, representing an approximate 13% increase in
> Star's total volume.
>
> Commenting on this performance, Chairman Irik P. Sevin stated, "We are
> pleased that in the fiscal third quarter, the Partnership performed operationally in-
> line with expectations. This enabled Star to continue to realize the benefits from
> a) this past winter's cold temperatures; b) the contribution from our acquisition
> program; and, c) continued per gallon gross margin expansion. Of possibly even
> greater long-term significance, however, was the heating oil division's progress
> this past quarter in commencing the implementation of its Business Process
> Improvement Program, the results of which we hope to begin realizing in fiscal
> 2004."

Mr. Sevin went on to note, "We were also gratified with the continuation of Star's active but disciplined acquisition program, highlighted by the Partnership's selection as the purchaser of Valero's home heating properties."

51.     On December 4, 2003, the Individual Defendants caused the Company to issue a press release entitled "Star Gas Partners, L.P. Reports 2003 Fiscal Fourth Quarter and Year End Results, Announces Ten Acquisitions in Fiscal 2003."  The press release stated in relevant part:

Star Gas Partners, L.P. (the "Partnership" or "Star"), a diversified home energy distributor and services provider specializing in heating oil, propane, natural gas and electricity, today reported results for the fiscal 2003 fourth quarter and the year ended September 30, 2003.

Star also reported that since July 1, 2003 it has completed the purchase of three heating oil and propane companies with 47,000 customers.  During fiscal 2003, Star acquired ten retail distributors with over 100,000 customers and 112 million gallons of annual volume.

For the fiscal 2003 fourth quarter, Star's sales rose 26% to a record $175 million, as compared to $139 million in the fourth quarter of fiscal 2002.  This significant increase was primarily due to higher energy prices, as well as a 10% volume increase resulting from the contribution of 14 acquisitions made since July 1, 2002.

Star's fiscal fourth quarter is a non-heating period, and the operating loss increased from $43.5 million in 2002 to $50.4 million in 2003 primarily due to $8.7 million of items associated with: a) $4.5 million of reorganization expenses related to the previously announced heating oil division's Business Process Improvement Program; b) the impact of acquisitions that are expected to be accretive on a full-year basis but, as anticipated, generated fourth quarter operating losses; and, c) the current period expense associated with the increased value of previously granted equity-based compensation that had declined in fiscal 2002.  In addition, results were impacted by lower depreciation and amortization of $0.8 million.

The fiscal 2003 fourth quarter net loss increased to $61.1 million from $53.0 million in the same period in fiscal 2002 due to the items that impacted the increased operating loss as well as $2.0 million in higher net interest costs largely associated with debt incurred to finance Star's acquisition program; these were

-24-

slightly offset by lower income tax expense of $1.0 million.  Diluted net loss per limited partner unit, which includes the above referenced costs, rose to $1.82 per unit in the fourth quarter of fiscal 2003, from $1.70 per unit in the fourth quarter of fiscal 2002.

Fiscal 2003 sales increased 43% to a record $1.5 billion, compared to $1.0 billion in fiscal 2002, due both to volume expansion and higher energy prices. Operating income for fiscal 2003 increased 85% to $48.6 million, from $26.3 million in fiscal 2002.  This was due primarily to: a) an approximate 23% rise in volume largely driven by colder temperatures; b) the contribution from the 12 acquisitions consummated in fiscal 2002 that had a full year's positive impact on Star's results in fiscal 2003; c) approximately a 1 cent per gallon gross profit margin increase, notwithstanding historically high energy prices; and, d) $5.9 million in lower depreciation and amortization expense largely due to the impact of SFAS 142.  Fiscal 2003 operating income was negatively impacted by approximately $20.6 million resulting from: a) $9.4 million of reorganization expenses related to the previously announced heating oil division's Business Process Improvement Program; b) expense associated with the increase in value in fiscal 2003 of previously granted equity-based compensation that had declined in fiscal 2002; and, c) fiscal 2003 acquisitions consummated largely after the heating season, whereby partial year results had a negative effect on annual performance.  In addition, management estimates that the implementation of a more efficient delivery scheduling process, which lowered volume in fiscal 2003 by approximately 10 million gallons, resulted in lower operating income of approximately $3.8 million.

Net income for fiscal 2003 was $0.2 million compared, to an $11.2 million net loss in fiscal 2002. Income before the cumulative effect of the change in accounting principle for the adoption of SFAS No. 142, relating to accounting for goodwill and other intangibles, rose to $4.1 million, from the $11.2 million loss in fiscal 2002.  The fiscal 2003 net income increase was primarily attributable to improved weather conditions, the full year's effect of acquisitions made in fiscal 2002, increased margins, and lower depreciation and amortization expense. These factors more than offset the impact of expenses relating to previously granted equity, reorganization costs, partial year results from fiscal 2003 acquisitions, higher income tax expense and the effect of SFAS No. 142.  Fiscal 2003 diluted net income per limited partner unit, which included the above referenced costs, was $0.01 per unit, compared to a $0.38 per unit loss in fiscal 2002.  Income per limited partner unit before the cumulative effect of the change in accounting principles for the adoption of SFAS No. 142 increased to $0.12 per unit, versus the $0.38 per unit loss in fiscal 2002.

Star also announced that during the three months ended September 30, 2003 the Partnership acquired three heating oil and propane companies consisting of approximately 47,000 customers, which are expected to add 53 million gallons of annual volume.  The total acquisition price for these three purchases was $39 million, representing a 5.2x anticipated EBITDA multiple. The largest acquisition was the previously announced Ultramar New England Home Energy business, a unit of Valero Energy Corporation. The other two companies were Cincinnati Propane of Cincinnati, Ohio and Humphrey Oil of Tiverton, Rhode Island.

In fiscal 2003 the Partnership acquired ten heating oil and propane companies with over 100,000 customers, representing 112 million gallons of volume, with a purchase price of approximately $76 million; this represents a 5.2x anticipated EBITDA multiple.  In keeping with Star's balanced financing strategy, $34.2 million of the aggregate purchase amount was financed through a common unit offering in August 2003.

Commenting on this performance, Chairman Irik P. Sevin stated, "This fiscal year's EBITDA, which includes a charge of $3.9 million for the cumulative effect of a change in accounting principle for the adoption of SFAS 142, increased 14% to $97.7 million.  This was especially gratifying given that it was achieved despite the $24 million impact of the following items: a) the heating oil division's Business Process Improvement Program; b) costs associated with the value of previously granted equity; c) the impact of the heating oil division's delivery rescheduling initiative; and, d) the post-heating season impact of acquisitions made during the year."

Mr. Sevin went on to note that, "We are also excited with the continued success of Star's very active but disciplined acquisition program and the Business Process Improvement Program.  Over the past two years, Star has continued to successfully execute its strategy of buying small and mid-sized heating oil and propane companies, purchasing 22 companies with an average 6 million gallons, at an average 5.4x EBITDA multiple."

The heating division's Business Process Improvement Program was designed to capitalize on Petro's unique size in the highly fragmented heating oil industry by accessing technology in order to operate both more efficiently and with a higher degree of customer sensitivity.  The Program, which has developed and evolved over the past five years, took a major step towards completion this past April with the 19% reduction in administrative staff and the reconfiguring of Petro into a functionally specialized organization.   The $9.4 million reorganization costs in fiscal 2003 are part of an overall $28.1 million program, of which $1.6 million remains to be spent in fiscal 2004.  Management expects this

-26-

entire Program to enhance operating income by approximately $15.0 million on
an annual basis, of which $8.4 million is expected to be realized in 2004.

52.     On January 14, 2004, the Individual Defendants caused the Company to issue the

press release entitled "Star Gas Partners Prices $35 Million Senior Notes Issue." The press

release stated in relevant part:

> Star Gas Partners, L.P. (the "Partnership" or "Star"), a diversified home energy
> distributor and services provider specializing in heating oil, propane, natural gas
> and electricity, today announced the pricing of $35 million of its 10 1/4% Senior
> Notes due 2013 (the "Notes").  The Notes were priced at a premium to par for
> total gross proceeds of $38.7 million, which represents a yield-to-worst of 8.2%.
> Net proceeds from the offering will be used to repay indebtedness.  The sale of
> the Notes is expected to close January 22, 2004.

53.     On January 29, 2004, the Individual Defendants caused the Company to issue a

press release entitled "Star Gas Partners, L.P. Reports 2004 Fiscal First Quarter Results; Declares

First Quarter Distribution."  The press release stated in relevant part:

> Star Gas Partners, L.P. (the "Partnership" or "Star"), a diversified home
> energy distributor and services provider specializing in heating oil, propane,
> natural gas and electricity, today reported results for the fiscal 2004 first quarter
> ended December 31, 2003.  Star also declared its $0.575 per unit Minimum
> Quarterly Distribution on all units for the quarter ended December 31, 2003,
> payable on February 13, 2004 to unitholders of record as of February 9, 2004.

> For the three months ended December 31, 2003, Star's sales increased
> 12.7% to a record $434 million, from $385 million in the first quarter of fiscal
> 2003.  This was due to both higher energy prices and increased volume as the
> Partnership's acquisition program more than offset weather that was 10% warmer
> than the relatively cold first quarter in fiscal 2003.

> Operating income for the three months ended December 31, 2003
> increased 8.4% to $31.9 million, from $29.4 million for the comparable period in
> fiscal 2003, despite the first quarter's warmer weather.  This was primarily due to:
> a) the contribution from 12 acquisitions with annual volume of 113 million
> gallons completed since October 1, 2002; b) heating oil and propane gross profit
> margins increasing 1.5 cents per gallon; and, c) improved operating expenses and
> revenues from related products and services resulting from the heating oil

-27-

division's Business Process Improvement Program.   These increases were partially offset by the impact of warm weather.

Net income for the three months ended December 31, 2003 increased 20.4% to $19.3 million, from $16.0 million in the comparable period last year. This was primarily due to the operating income increase referred to above, as well as the adoption in Fiscal 2003 of SFAS No. 142 relating to accounting for goodwill and other intangibles which reduced last year's first quarter net income by $3.9 million, offset during this year's fiscal quarter by an increase in interest expense of $2.5 million.  Diluted net income per limited partner unit increased to $0.56, from $0.49 per unit in the comparable period in fiscal 2003.  Diluted income per limited partner unit before the impact of SFAS No. 142 was $0.61 for the quarter ended December 31, 2002.

EBITDA for the fiscal 2004 first quarter increased by 21% to $46.4 million, from $38.4 million in the comparable period last year.  This EBITDA increase was primarily attributable to the improvement in Star's operating performance and acquisitions, which more than offset the warmer temperatures. The quarter-to-quarter comparison was also impacted by the adoption of SFAS No. 142, which reduced EBITDA by $3.9 million in the fiscal 2003 first quarter.

Star also announced the acquisition of two propane companies with 2,400 customer accounts between them and an aggregate annual volume of 1.0 million gallons.

In commenting on Star's fiscal 2004 first quarter performance, Chairman Irik P. Sevin stated: "We are extremely pleased with this quarter's results as operating income increased approximately 8% despite weather that was 10% warmer than last year and 4% warmer than normal, as reported by the National Oceanic and Atmospheric Administration.  This performance resulted primarily from the following three factors: First, the Partnership successfully continues its active but disciplined acquisition program.   In fiscal 2003, the Partnership acquired ten companies representing an aggregate of 112 million gallons.  Since most of this volume was acquired subsequent to last year's winter heating season, these acquisitions are having a positive effect on fiscal 2004 results, as compared to fiscal 2003.  Second, Star was able to continue the expansion, in both the propane and home heating oil segments' per gallon gross profit margins, despite historically high energy prices.  Third, for over five years, we have been developing and implementing the heating oil division's Business Process Improvement Program, which was designed to capitalize on that operation's size advantage within the highly fragmented home heating oil industry.  While the full benefits of that program have yet to be realized, we are pleased that the Partnership began to achieve some tangible benefits in the first quarter of 2004."

Mr. Sevin added: "We are also pleased that Star was able to improve its liquidity, most recently through the sale of $35 million of long-term notes in January 2004.  This offering was executed at approximately 2.25% below the yield on Star's last public note issuance, indicating the public debt markets' favorable view of the Partnership's performance.  The proceeds of the offering will be used to repay $18.3 million in note amortizations for fiscal 2004 and amounts borrowed under Star's $100 million bank term loan facilities.  As a result of the offering, Star will have approximately $35.0 million outstanding under those facilities leaving $65.0 million available for future uses."

54.     On February 2, 2004, the Individual Defendants caused the Company to issue a press release entitled "Star Gas Announces Pricing of 1.3 Million Unit Offering at $24.80."  The press release stated in relevant part:

Star Gas Partners, L.P. (the "Partnership"), a diversified home energy distributor and services provider specializing in heating oil, propane, natural gas and electricity, announced today the pricing of an underwritten public offering of 1.3 million common units at a public offering price of $24.80 per common unit. The Partnership also granted to the underwriters of this offering a 30-day option to purchase up to an additional 195,000 common units to cover any over-allotments. The offering is underwritten by A.G. Edwards & Sons, Inc., UBS Investment Bank, and RBC Capital Markets and is scheduled to close on February 5th.

55.     On April 29, 2004, the Individual Defendants caused the Company to issue a press release entitled "Star Gas Partners, L.P. Reports Fiscal 2004 Second Quarter Results; Declares Second Quarter Distribution."  The press release stated in relevant part:

Star Gas Partners, L.P. (the "Partnership" or "Star"), a diversified home energy distributor and services provider specializing in heating oil and propane, today reported results for the fiscal 2004 second quarter and six months ended March 31, 2004.  Star also declared its $0.575 per unit Minimum Quarterly Distribution on all units for the quarter ended March 31, 2004, payable on May 14, 2004 to unitholders of record as of May 10, 2004.

For the three months ended March 31, 2004, Star's volume increased approximately 1% to 352 million gallons, versus 349 million gallons in the second quarter of fiscal 2003.  This increase is primarily attributable to the effect

-29-

of Star's acquisition of 11 companies since January 1, 2003, which more than offset the negative impact of changes in delivery scheduling, temperatures that were warmer in the second quarter of 2004 than the colder weather experienced in the comparable prior year period and net customer losses.  Notwithstanding the effect of Star's acquisition program and 1.5 cents per gallon higher heating oil and propane gross profit margins, operating income declined by $0.3 million to $93.4 million.  This was due to $1.8 million in higher depreciation and amortization expense, as well as the effect of warmer weather, delivery patterns and account losses.

Net income for the three months ended March 31, 2004 declined to $80.7 million, from $83.2 million in the comparable period last year.  This was primarily due to lower income from discontinued operations, relating to the Partnership's Total Gas & Electric subsidiary, which was sold on March 31, 2004, an increase in interest expense, as well as from the slight decline in operating income.  Diluted net income per limited partner unit declined to $2.27 per unit in the fiscal 2004 second quarter from $2.53 in the comparable period in fiscal 2003 due to the decline in net income as well as the increased number of units outstanding used to finance Star's acquisition program and improve its capital structure.

                                                ***

During the quarter, the Partnership raised $73.6 million by issuing $35.0 million of its Senior Notes due 2013, at a premium to par for total proceeds of $38.6 million, and by selling 1.495 million common units for $35.0 million.  The proceeds from these financings were used to repay amounts outstanding under the Partnership's acquisition facilities and to fund all scheduled debt amortizations for fiscal 2004.  As a result of these financings, the Partnership had $96.6 million available under its revolving acquisition facilities as of March 31, 2004.

Star also reported that on March 30, 2004, it purchased Tri-County Fuel Oil of Perth Amboy, NJ. Tri-County had 1,650 customers and 1.5 million gallons of annual volume.

For the six months ended March 31, 2004, volume increased 2% to 583 million gallons, versus 571 million gallons in the same period in fiscal 2003, despite 5% warmer temperatures than last year.  This was due to the effect of the 13 companies acquired since October 1, 2003.  Operating income for the six months ended March 31, 2004 increased approximately $0.4 million to $124.6 million, from $124.2 million in the comparable period in 2003.  This increase was due primarily to Star's acquisition program and an approximate 1.0 cent per gallon

-30-

increase in per gallon gross profit margins.  Higher depreciation and amortization of $3.5 million largely relating to acquisitions reduced these increases.

Net income for the period increased approximately $0.8 million to $100.0 million, from $99.2 million in the comparable period in fiscal 2003.  This was primarily due to the aforementioned operating income increase, as well as the adoption in fiscal 2003 of SFAS No. 142 relating to accounting for goodwill and other intangibles, which reduced fiscal 2003 first half net income by $3.9 million, offset by increased interest expense in fiscal 2004.  Diluted net income per limited partner unit declined from $3.02 in the first six months of fiscal 2003, to $2.86 in the comparable period in fiscal 2004, due to an increase in the number of units outstanding relating to the Partnerships acquisition program and its improved capital structure.

In commenting on this performance, Chairman Irik P. Sevin stated: "We are pleased by a) Star's continued aggressive, yet disciplined acquisition program; b) the initial benefits from the Petro Division's Business Process Redesign Program; and, c) the excellent performance of the propane division, which has successfully integrated nine acquisitions since October 1, 2003, while at the same time improving base business operations.  In addition, Star's capital raising activities has improved its financial flexibility."

Mr. Sevin went on to note: "While we achieved certain benefits from the Petro Division's Business Process Redesign Program, they were not as significant as we had expected in this, the first year of its execution.  However, we now have the foundation of a platform, which we believe will enable us to capitalize on Petro's unique size to build a brand in the highly fragmented home heating oil industry.  This should enable us to eventually grow internally as well as through acquisitions.  We are also pleased with having sold, for a slight gain, our TG&E subsidiary, which we believe did not fit with the Partnership's long-term strategy."

56.    On July 8, 2004, the Individual Defendants caused the Company to issue a press release entitled "Star Gas Partners Prices $30 Million Senior Notes Issue."  The press release stated in relevant part:

Star Gas Partners, L.P. (the "Partnership" or "Star"), a diversified energy distributor and services provider, specializing in heating oil and propane, today announced the pricing of $30 million of its 10 1/4% Senior Notes due 2013 (the "Notes").  The Notes were priced at a premium to par for total gross proceeds of $31.9 million, which represents a yield-to-worst of 8.97%.  Net proceeds from the

offering will be used to repay indebtedness.  The sale of the Notes is expected to close July 15, 2004.

57.     On July 29, 2004, the Individual Defendants caused the Company to issue a press release entitled "Star Gas Partners, L.P. Reports Third Quarter Operating Results and Common Unit Distribution."  The press release stated in relevant part:

> Star Gas Partners, L.P. (the "Partnership" or "Star"), a diversified home energy distributor and services provider specializing in heating oil and propane, today reported results for the fiscal 2004 third quarter and nine months ended June 30, 2004.   For the three months ended June 30, 2004, Star's volume increased approximately 2% despite temperatures that were 28% warmer than in the comparative period in the prior year.  This increase was primarily attributable to the effect of Star's acquisition of 14 companies since April 1, 2003, representing approximately 119 million gallons of annual volume, which more than offset the negative impact of weather and customer losses, primarily a result of high energy prices.
>
> Star's fiscal third quarter is predominantly a non-heating period and its operating loss rose approximately $4 million, from $26 million to $30 million due to a) warmer temperatures in the early part of the quarter impacting results by approximately $9 million; b) gross profit margins that were lower than the unusually high levels experienced in the third quarter of fiscal 2003; and c) an increase in Depreciation and Amortization expense.  These items were partially offset by a) lower equity related compensation expense; b) some operating improvements associated with the Heating Oil Division's Business Process Improvement Program; as well as c) a change in heating oil delivery patterns.
>
> Star's third quarter seasonal net loss increased approximately $5 million to $43 million due to the aforementioned operating loss increase and higher net interest expense associated with the Partnership's acquisition program.  Diluted net loss per limited partner unit rose to $1.18 per unit in the third quarter of fiscal 2004, from $1.15 per unit in the third quarter of fiscal 2003.
>
> EBITDA for the three months ended June 30, 2004 was a loss of $15.8 million, versus a loss of $12.6 million in the fiscal 2003 third quarter.  This decrease in EBITDA was primarily due to the warmer weather referred to above.
>
> For the nine months ended June 30, 2004, sales increased approximately 5% to $1.3 billion, compared to $1.2 billion in the same period in fiscal 2003, due both to volume expansion and higher energy prices.  Volume for the first nine

months of FY 2004 increased 2% to 686 million gallons from 673 million gallons in the same period in the prior year.  This was due to Star's acquisition program which more than offset 8% warmer temperatures and net customer loss in the first three quarters of fiscal 2004 versus 2003.  Operating income for the nine months ended June 30, 2004 decreased approximately $4 million to $95 million due to a) the estimated $22 million impact of warmer temperatures; b) the effect of an approximate 4% net customer loss resulting from both high energy prices and diminished service levels at Petro associated with the initial stages of its Business Process Improvement Program; and c) increased Depreciation and Amortization expense.   This was offset by a) the estimated $16 million impact from the Company's acquisition program; b) a 1.6 cent per-gallon expansion in gross profit margin in the base operations; and c) certain improvements in operating results primarily associated with the Heating Oil Division Business Process Improvement Program.

Net income for the nine months ended June 30, 2004 declined approximately $4 million to $57 million, from $61 million in the comparable period in fiscal 2003. This decrease was primarily attributable to the operating income decline, as well as to higher interest expense and debt issuance costs, offset by lower income tax expense, lower income from discontinued operations and the adoption of SFAS No. 142 for discontinued operations in fiscal 2003, which resulted in a charge of $3.9 million.  Diluted net income per limited partner unit for the nine months ended June 30, 2004 declined to $1.62 per unit from $1.87 per unit during the same period in fiscal 2003.

EBITDA for the nine months ended June 30, 2004 rose approximately $1 million to $138 million from $137 million in the same period last year due to acquisitions and gross profit margin improvements.

Star also announced that during the period from April 1, 2004 to date, the Partnership acquired four heating oil and propane companies consisting of approximately 7,700 customers.  The four companies were Fuels by Keith of Brandon, VT; B&C Fuel Oil of Pinebush, NY; Shiavoni Propane of Southampton, NY; and Mabob of Kissimmee, FL.

In commenting on these results, Chairman Irik Sevin stated: "We are very pleased with certain aspects of this year's performance, most notably that our aggressive, yet disciplined acquisition program largely offset the impact of temperatures that were considerably warmer than last year's.  However, there were two aspects of the business that were particularly challenging.  The first was the implementation of the Heating Oil Division's Business Process Improvement Program.  Since this entailed a complete change in the way Petro conducts it business, it is understandable that the first heating season under the new model

could require certain adjustments.  As a result of the actions taken throughout this past year, we are beginning to see many of the operational and customer satisfaction benefits originally anticipated.  Having made many of the adjustments required, we believe the new platform could provide Petro with a distinct operating and marketing competitive advantage going forward.

"The second challenge faced, especially this past quarter, was the unprecedented rise in energy costs.  The movement in petroleum prices generally created a significantly heightened level of customer concern over propane and heating oil prices and resulted in base company customer loss.

"While these two factors had a negative impact on first nine months results, they now appear to offer Star certain longer-term opportunities.  First the Propane Division has already taken advantage of greater consumer awareness to launch a marketing campaign, which, while early, has achieved certain positive results.  Second, the Heating Oil Division is utilizing its new centralized platform, marketing expertise and consumer research to offer consumers new ways to address their potentially high energy bills. It is anticipated that this new product will be launched in late August/September, when consumers are most sensitive to selecting a fuel oil provider for the upcoming heating season."

### THE TRUTH IS REVEALED

58.     On October 18, 2004, *TheStreet.com* issued an article entitled "Stocks In Motion: Star Gas."  The article stated in relevant part:

Earnings at Star Gas' heating oil unit are expected to decline substantially, the company said, which will not permit it to meet the borrowing conditions under its working capital line.  Star is currently in talks with lenders to modify conditions and other terms that would allow its business unit to operate through the winter. If lenders do not agree, however, to offer modified terms, Star said it could be forced to seek alternative financing on "extremely disadvantageous" terms or even be forced to seek bankruptcy protection.

59.     On this news, Star Gas' stock dropped to $4.32 per share from a closing price of $21.60 on the previous trading day.  AG Edwards downgraded Star Gas' stock the same day.

### REASONS THE STATEMENTS WERE IMPROPER

-34-

60.     In order to inflate the price of Star Gas' stock, the Individual Defendants caused the Company to falsely report its results for FY:00, FY:01, FY:02, FY:03 and FY:04 through failing to disclose the following certain material facts *inter alia*;

(a)     Star Gas was experiencing serious problems as a result of its reorganization, particularly in the area of customer service, which was deteriorating rapidly, resulting in a migration of customers;

(b)     the purported cost savings from the restructuring in the heating oil division had not materialized and, in fact, had resulted in operating deficiencies that negatively impacted the Company;

(c)     the Company had not adequately hedged against a sharp rise in heating oil prices during the Relevant Period;

(d)     the Company was ill-equipped to handle the surge in heating oil prices during the Relevant Period and falsely comforted investors with representations that Star Gas would simply pass on high wholesale prices to retail customers;

(e)     the Company's problems and deteriorating business seriously threatened its ability to pay out its quarterly distribution;

(f)     the Company's business had deteriorated so sharply over the Relevant Period that it was in palpable danger of breaching financial and/or performance covenants in its loan agreements, thereby seriously jeopardizing its liquidity and viability;

(g)     the Company's second quarter 2004 claimed profit margins were an aberration and not indicative of the Company's success or ability to pass on the heating oil price

-35-

increase because the Company had earlier acquired heating oil (sold in the second quarter) at a much lower basis; and

> (h)    that as a result of (a)-(g), defendants were facing imminent bankruptcy and would no longer be able to service the Company's debt, all of which would halt the Company's ability to maintain the Company's credit rating and/or obtain future financing.

61.    The second quarter results were included in Form 10-Q filed with the SEC on July 29, 2004 was signed by defendants Trauber and Sevin. The results were also included in press releases and disseminated to the public

62.    In its July 29, 2004 press release the Individual Defendants caused the Company to state: "As a result of the actions taken throughout this past year, we are beginning to see many of the operational and customer satisfaction benefits originally anticipated," however this was not the case. Contrary to the positive statement in the press release, the Individual Defendants knew and did not disclose to the public the Company's business process improvement program was not generating profits and the Company was facing a decreasing customer base as a direct result of the problems implementing the business process improvement program.

63.    Although the heating oil sold in the second quarter of FY:04 had been acquired earlier at a lower basis, the Individual Defendants falsely represented that Star Gas was having difficulty passing on the increase in retail price to its costumers.  Since the true reason the of decreased profit margins was not disclosed, Star Gas' 2004 financial statements were not a fair representation of Star Gas' results and were presented in violation of Generally Accepted Accounting Principals ("GAAP") and SEC rules.

64.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

65.     In Star Gas' 2004 Form 10-Q, it represented the following position:
The Partnership believes that it may not be able to pass all these increases on to its customers through retail sales prices. If wholesale prices remain at current levels, per gallon gross profit margins will be reduced and results will be adversely impacted.

66.     During the Relevant Period, Star Gas improperly reported the cause and severity of its failure to maintain its profit margins in the Company's Petro heating division. The true reason the Company was not able to maintain or generate profits was due to the fact that Company was experiencing massive delays in the centralization of its dispatch system which caused its decreasing base of customers to go to the Company's competitors. The true facts known to the Individual Defendants were misrepresented and materially false in violation of GAAP.

67.     Due to these accounting improprieties, the Individual Defendants caused the Company to present its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)      The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, 34);

(b)      The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, 40);

(c)      The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, 50);

(d)      The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, 42);

(e)      The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, 58-59);

(f)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, 79); and

(g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, 95, 97).

68.     Further, the undisclosed adverse information concealed by defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

69.     As a result of the Individual Defendants' actions, Star Gas' market capitalization has been damaged by over $193 million.  At the same time that the defendants were causing Star Gas to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling $829,684.08 of their personally held stock.

**ILLEGAL INSIDER SELLING**

70.     While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Star Gas stock:

| Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | | | | |
| Ami A. Trauber | 5/6/2004 | 1,000 | $ 21.80 | $ 21,800.00 |
| | 5/5/2004 | 1,000 | $ 21.30 | $ 21,300.00 |
| | 5/4/2004 | 1,000 | $ 21.57 | $ 21,570.00 |
| | 5/3/2004 | 1,132 | $ 21.94 | $ 24,836.08 |
| | 5/7/2004 | 1,000 | $ 21.05 | $ 21,050.00 |
| | | **5,132** | | **$ 110,556.08** |
| | | | | |
| Joseph P. Cavanaugh | 2/13/2004 | 1,000 | $ 21.73 | $ 21,730.00 |
| | 2/10/2004 | 700 | $ 21.87 | $ 15,309.00 |
| | 2/10/2004 | 300 | $ 21.88 | $ 6,564.00 |
| | 2/9/2004 | 1,400 | $ 21.75 | $ 30,450.00 |
| | 2/9/2004 | 500 | $ 21.63 | $ 10,815.00 |
| | 2/9/2004 | 200 | $ 21.90 | $ 4,380.00 |
| | 2/6/2004 | 200 | $ 21.70 | $ 4,340.00 |
| | 2/6/2004 | 200 | $ 21.50 | $ 4,300.00 |
| | 5/3/2003 | 1,000 | $ 18.15 | $ 18,150.00 |
| | 5/2/2003 | 1,000 | $ 18.05 | $ 18,050.00 |
| | 5/2/2003 | 500 | $ 18.08 | $ 9,040.00 |
| | | **7,000** | | **$ 143,128.00** |
| | | | | |
| Thomas J. Edelman | 12/15/2003 | 8,800 | $ 23.50 | $ 206,800.00 |
| | 12/12/2003 | 11,200 | $ 23.50 | $ 263,200.00 |

| | | 20,000 | | | $ | 470,000.00 |
|---|---|---|---|---|---|---|
| | | | | | | |
| Richard F. Ambury | 5/6/2004 | 2,500 | $ | 20.82 | $ | 52,050.00 |
| | 2/25/2004 | 2,500 | $ | 21.58 | $ | 53,950.00 |
| | | 5,000 | | | $ | 106,000.00 |
| | | | | | | |
| | TOTAL | 30,132 | | | $ | 829,684.08 |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

71.     Plaintiff brings this action derivatively in the right and for the benefit of Star Gas to redress injuries suffered, and to be suffered, by Star Gas as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Star Gas is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

72.     Plaintiff will adequately and fairly represent the interests of Star Gas in enforcing and prosecuting its rights.

73.     Plaintiff is and was an owner of the stock of Star Gas during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

74.     The current Board of Star Gas consists of the following seven individuals: defendants Sevin, Audrey Sevin, Biddelman, Edelman, Massoud, Nicoletti and Russell.  Plaintiff

has not made any demand on the present Board of Star Gas to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons;

75.     As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non-public information regarding the improper accounting.  While in possession of this material adverse non-public information regarding the Company, the following current members of the Star Gas Board participated in the illegal insider selling:

(i)     During the Relevant Period, Edelman sold 20,000 shares of Star Gas stock for proceeds of $470,000.  Because defendant Edelman received a personal financial benefit from the challenged insider trading transactions, defendant Edelman is interested and any demand upon him is futile;

76.     The Compensation Committee of the Board determines the annual salary, bonus and other benefits, direct and indirect, of all named executive officers and reviews and recommends to the Board any and all matters related to benefit plans covering the officers and other employees.  The Compensation Committee is comprised of defendants Edelman and Massoud. As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Edelmen and Massoud.  To do so would jeopardize each defendant's personal financial compensation.  Thus, demand on defendants Sevin, Biddelman, Nicoletti, Russell and Audrey Sevin is futile;

77.     The principal professional occupation of defendant Sevin is his employment with Star Gas, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.  Specifically, for FY:00, FY:01, FY:02 and FY:03, Star Gas paid defendant $1,746,088, $2,190,166 $610,850 and $1,502,200 respectively, in salary, bonus and other compensation.  For FY:00 and FY:03 Star Gas granted defendant Sevin 400,000 and 77,419 options to purchase Star Gas stock respectively. Accordingly, defendant Sevin lacks independence from defendants, Edelman and Massoud defendants who are not disinterested and/or independent and who exert influence over defendant Sevin's compensation by virtue of their position as of the Compensation Committee.  This lack of independence renders defendant Sevin incapable of impartially considering a demand to commence and vigorously prosecute this action.  Defendants Sevin and Audrey Sevin dominate and control the entire Board;

78.     According to Star Gas' Form 10-K Statement filed with the SEC on or about December 22, 2003, defendant Sevin has 513,438 in unexercisable unit appreciation rights that were valued to be worth $6,290,375 as of September 2003. These unit appreciation rights vest on October 2005. Because of these unit appreciation rights defendant Sevin will not take the action plaintiff request in fear of jeopardizing this highly lucrative compensation;

79.      According to Star Gas' Form 10-K Statement filed with the SEC on or about December 22, 2003, defendants Nicoletti, Biddelman and Russell were, during the Relevant Period, members of the Audit Committee.  According to the Audit Committee Charter, the Audit Committee is responsible for: (i) the review the Partnership's annual financial statements and any reports or other financial information submitted to any governmental body, or the public, including any certification, report, opinion, or review rendered by the independent auditors; (ii)

-43-

the review of regular internal reports to management prepared by the internal auditing

department and management's response;  (iii) the review with financial management and, if

deemed necessary, the independent auditors for each form 10-Q and each form 10-K; (iv) the

related press releases prior to its filing or prior to the release of earnings; and (v) the discussion

with financial management earnings guidance provided to analysts and ratings agencies.  In

FY:00, FY:01, FY:02, the Audit Committee met six times. In FY:03 the Audit Committee met

eight times. In FY:03 defendant Nicoletti was designated the Audit Committee financial expert.

Nonetheless, the Audit Committee recommended that the Board include the improper audited

consolidated financial statements in Star Gas' Annual Report on Form 10-K for the years ending

December 31, 2000, December 31, 2001, December 31, 2002 and  December 31, 2003 as filed

with the SEC.  By such actions, defendants Nicoletti, Biddelman and Russell breached their

duties by causing or allowing the improper financials described above.  As a result of these

defendants' breach of their duties, any demand upon them is futile;

        80.     The entire Star Gas  Board and senior management participated in the wrongs

complained of herein.  Star Gas' directors are not disinterested or independent due to the

following: defendants Sevin, Audrey Sevin, Biddelman, Edelman, Massoud, Nicoletti and

Russell served on the Star Gas  Board during the Relevant Period.  Pursuant to their specific

duties as Board members, each was charged with the management of the Company and to

conduct its business affairs.  Each of the above-referenced defendants breached the fiduciary

duties that they owed to Star Gas  and its shareholders in that they failed to prevent and correct

the improper financials.  Thus, the Star Gas  Board cannot exercise independent objective

judgment in deciding whether to bring this action or whether to vigorously prosecute this action

because its members are interested personally in the outcome as it is their actions that have

subjected Star Gas to millions of dollars in liability for possible violations of applicable

securities laws;

81.      The Individual Defendants, because of their inter-related business, professional

and personal relationships, have developed debilitating conflicts of interest that prevent the

Board members of the Company from taking the necessary and proper action on behalf of the

Company as requested herein.  In addition to the conflicts that exist as a result of their

participation in the improper accounting and as detailed herein *supra*, the majority of the Board,

including the defendants listed below, are subject to the following prejudicial entanglements:

### (i)      *Defendant Audrey Sevin and defendant Sevin have an entangling familial relationship:*

Defendant Audrey Sevin is the mother of defendant Sevin.  Because of this familial and entangling business and professional relationships, neither defendant Audrey Sevin nor defendant Sevin will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

82.      The Director Defendants of Star Gas, as more fully detailed herein, participated

in, approved and/or permitted the wrongs alleged herein to have occurred and participated in

efforts to conceal or disguise those wrongs from Star Gas' stockholders or recklessly and/or

negligently disregarded the wrongs complained of herein, and are therefore not disinterested

parties;

83.      In order to bring this suit, all of the directors of Star Gas would be forced to sue

themselves and persons with whom they have extensive business and personal entanglements,

which they will not do, thereby excusing demand;

84.     The acts complained of constitute violations of the fiduciary duties owed by Star Gas' officers and directors and these acts are incapable of ratification;

85.     Each of the Director Defendants of Star Gas  authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

86.     Any suit by the current directors of Star Gas to remedy these wrongs would likely expose the Individual Defendants and Star Gas to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

87.     Star Gas has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Star Gas any part of the damages Star Gas suffered and will suffer thereby;

88.     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal

liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.  In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do.  Thus, demand is futile; and

89.     If Star Gas' current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Star Gas.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Star Gas against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Star Gas, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate  recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause Star Gas to sue them, since they will face a large uninsured liability.

90.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Star Gas for any of the wrongdoing alleged by plaintiff herein.

91.    Plaintiff has not made any demand on shareholders of Star Gas to institute this action since such demand would be a futile and useless act for the following reasons:

92.    Star Gas is a publicly held company with 32,166,000 shares outstanding, and thousands of shareholders;

93.    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

94.    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

**Against the Insider Selling Defendants for Breach of Fiduciary
Duties for Insider Selling and Misappropriation of Information**

95.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

96.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Star Gas common stock on the basis of such information.

97.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Star Gas common stock.

98.     At the time of their stock sales, the Insider Selling Defendants knew that the
Company's revenues were materially overstated.  The Insider Selling Defendants' sales of Star
Gas common stock while in possession and control of this material adverse non-public
information was a breach of their fiduciary duties of loyalty and good faith.

99.     Since the use of the Company's proprietary information for their own gain
constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled
to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained
thereby.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty

100.    Plaintiff incorporates by reference and realleges each and every allegation
contained above, as though fully set forth herein.

101.    The Individual Defendants owed and owe Star Gas fiduciary obligations.  By
reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and
owe Star Gas the highest obligation of good faith, fair dealing, loyalty and due care.

102.    The Individual Defendants, and each of them, violated and breached their
fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

103.    Each of the Individual Defendants had actual or constructive knowledge that they
had caused the Company to improperly misrepresent the financial results of the Company and
failed to correct the Company's publicly reported financial results and guidance.  These actions
could not have been a good faith exercise of prudent business judgment to protect and promote
the Company's corporate interests.

104.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Star Gas has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

105.    Plaintiff on behalf of Star Gas has no adequate remedy at law.

## COUNT III

### Against All Defendants for Abuse of Control

106.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Star Gas, for which they are legally responsible.

108.    As a direct and proximate result of the Individual Defendants' abuse of control, Star Gas  has sustained significant damages.

109.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

110.    Plaintiff on behalf of Star Gas has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Gross Mismanagement

111.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties

with regard to prudently managing the assets and business of Star Gas in a manner consistent with the operations of a publicly held corporation.

113.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Star Gas has sustained significant damages in excess of hundreds of millions of dollars.

114.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

115.    Plaintiff on behalf of Star Gas has no adequate remedy at law.

**COUNT V**

**Against All Defendants for Waste of Corporate Assets**

116.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Star Gas to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions/billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

118.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

119.    Plaintiff on behalf of Star Gas has no adequate remedy at law.

**COUNT VI**

**Against All Defendants for Unjust Enrichment**

120.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

121.     By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Star Gas.

122.     Plaintiff, as a shareholder and representative of Star Gas, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Star Gas has an effective remedy;

C.     Awarding to Star Gas restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

D.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

THE PLAINTIFF
M. LEE ARNOLD, Derivatively On
Behalf of STAR GAS PARTNERS, L.P.

By_____
          R. Bartley Halloran
          Bar No. ct04305
          Law Offices of R. Bartley Halloran
          74 Batterson Park Road
          Farmington, CT 06034-0887
          Tel. (860) 676-3222

**JURY DEMAND**

Plaintiff demands a trial by jury.

_____

R. Bartley Halloran

DATED: November 12, 2004

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
1010 Second Ave., Suite 2360
San Diego, CA  92101
Telephone:  619/525-3990
Facsimile: 619/525-3991

Attorneys for Plaintiff